Trial counsel was ineffective for the following reasons:

One, forensic evidence, a photo of the crime scene, reviewed by an expert demonstrates that the killer was ungloved. This was different from the testimony of a co-venturer. The testimony from the cooperating witness was that Mr. Norris was gloved. Whoever killed the victim rummaged through a dresser with ungloved bloody hands. Trial counsel did not use the evidence.

Two, the forensic evidence, a photo, reviewed by an expert demonstrates that killer stole a CD player with blood on his hands. This bloody theft of the CD player materially contradicts the theory advanced by the government that the defendant traveled with two men to the scene, killed the victim, and remained at the scene for some time, and even requested help from others that they clean the property with hm. Trial counsel did not use the evidence.

An evenhanded review of this case is that the photographic evidence of the crime scene demonstrates that the victim was stabbed near the entry and fell against the screen door, the house was searched, and that whoever did this appears to have left the property with great dispatch. This was not the Government's theory/evidence.

Three, trial counsel was ineffective in not testing the material found under the victim's fingernails. There was material under the victim's fingernails. The victim and the murder were obviously in a violent struggle that led to the victim's death. Post-trial the court allowed testing of this material. It did not contain material demonstrating the killer or killer. In that the killer was ungloved one would believe that such evidence would have been found under Mr. Norris' fingernails.

Four, trial counsel did not offer evidence during trial that police first went to the crime scene responding to a disturbance call and found no blood or evidence of violence at that time. Nor did they find Mr. Norris. They returned several hours later to a crime scene including blood outside the door on the ground.

Five, trial counsel abandoned a possible alibi defense. The testimony of the defendant's mother that he had been home at the time of the killing presented an alibi. In contrast to this evidence, trial counsel admitted that Mr. Norris was at the scene in his opening and closing.

Six, trial counsel failed to rally evidence of other parties with possible motives for killing having killed the victim, his good friend. This was supported by the level of fear demonstrated by the victim before the killing. This was not adequately developed by trial counsel.

Seven, trial counsel was ineffective in investigating and failing to utilize information that materially impeached a Commonwealth's witness's statement that he was at the scene of the killing. Specifically, the time frames to which he testified did not match other referenced time points.

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss

TRIAL COURT
SUPERIOR COURT DEPARTMENT
INDICTMENT NO. 00-477

HAMPDEN COUNTY
SUPERIOR COURT
FILED

COMMONWEALTH

MAY 2 0 2005

vs.

*Marie S. Mazza*
CLERK-MAGISTRATE

JAMES NORRIS

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION FOR NEW TRIAL

### INTRODUCTION

On November 7, 2001, a jury convicted the defendant, James Norris

("Norris"), of murder in the first degree committed with deliberate premeditation

and with extreme atrocity and cruelty. The court imposed the mandatory

sentence of life in prison. On November 8, 2001, Norris filed a notice of appeal.[1]

On November 12, 2003, the defendant submitted this motion for new trial alleging

ineffective assistance of counsel. For the reasons discussed below, the

defendant's request for an evidentiary hearing and his motion for a new trial is

**DENIED**.

### FINDINGS OF FACT

The facts presented at trial are as follows. On January 17, 2000, Norris

called a friend, Dan Brunelle ("Brunelle") and asked him for a ride. After Brunelle

picked up Norris in his van, the two drove to the house of another friend, David

---

[1] The defendant's appeal to the Supreme Judicial Court has been stayed pending resolution of this motion.

170

Sto.  n. 5/23/05

Johnson ("Johnson"). Johnson testified that he had been watching the third quarter of a basketball game between the San Antonio Spurs and the Los Angeles Clippers when Brunelle and Norris picked him up. The three men then drove to the victim's house. Norris and Johnson went into the house while Brunelle waited outside. Sometime thereafter a fight broke out in the house. At that point, Johnson left the house; Brunelle got in his van and drove to another house. There he spoke with two men, Keith Freeman ("Freeman") and Charles Varner ("Varner") and told them about the fight. These two went to the victim's house and came upon the defendant in some nearby woods. He told them there had been a "tussle" and that they should leave. This they briefly did, but they immediately returned and, over the defendant's objections, entered the victim's house. There they found the victim's body on the basement stairs. Freeman and Varner left the house and made several calls to the police.

At some point after the murder, the defendant told another person, Bernard Williams ("Williams") that he had killed the victim because the victim owed him money and had been disrespecting him. Prior to trial, evidence came to light that two witnesses, Johnson and Williams, may have produced statements indicating that they knew nothing about the murder. These statements were allegedly destroyed by an investigating officer, Detective (now Sergeant) Dennis O'Connor. After the hearing, the court found that such a statement had been produced by Williams and destroyed by O'Connor, but that no such evidence existed in regard to Johnson. The jury heard testimony regarding the contents of Williams' destroyed statement. At trial, Norris' counsel

171

2

told the jury that the defendant had stumbled upon the body when he went to the house to conclude a drug deal, and had been accused only because Brunelle and Johnson had seen him at the scene.

## DISCUSSION

The defendant has raised seven separate bases for his claim of ineffectiveness of counsel: that his counsel was ineffective in 1) failing to exploit O'Connor's alleged destruction of two witness statements and the alleged demotion of O'Connor as a result of these acts; 2) failing to investigate or use "numerous" alibi witnesses; 3) failing to procure DNA testing of material allegedly found under the fingernails of the defendant; 4) not retaining an expert to examine the age of cuts found on the hands of the defendant; 5) not investigating or retaining an expert to test a shoeprint found outside the defendant's house; 6) not investigating the time of the basketball game watched by Johnson and impeaching him with this information; and 7) failing to impeach witnesses with their prior convictions.

### 1. The Standard of Review

"A trial judge may grant a new trial any time it appears that justice may not have been done." Commonwealth v. Cintron, 435 Mass. 509, 516 (2001), citing Mass. R. Crim. P. 30 (b). "Judges ... should only grant such a motion if the defendant comes forward with a credible reason which outweighs the risk of prejudice to the Commonwealth." Commonwealth v. Wheeler, 52 Mass. App. Ct. 631, 636 (2001).

172

"In a new trial motion asserting ineffective assistance of counsel, whether justice may not have been done equates with whether counsel was constitutionally ineffective." Id. The defendant bears a heavy burden in establishing ineffective assistance of counsel. Commonwealth v. Brookins, 33 Mass. App. Ct. 626, 631 (1992), rev'd on other grounds, 416 Mass. 97 (1993). To support such claims, the defendant must show "serious incompetency, inefficiency or inattention of [his] counsel – behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer – and . . . [that such inadequacies] likely deprived [him] of an otherwise available substantial ground of defense." Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). The burden is on the defendant to demonstrate that the alleged errors possibly weakened his case in some significant way as to require a new trial. See Commonwealth v. Schulze, 389 Mass. 735, 741 (1983).

Where, as here, the defendant has requested an evidentiary hearing, the court "must consider whether a substantial issue necessitating a hearing has been raised, looking to the seriousness of the claim presented and the adequacy of the defendant's factual showing." Commonwealth v. Figueroa, 422 Mass. 72, 77-78 (1996). "A claim of ineffective assistance of counsel ... raises an issue of constitutional importance that readily qualifies as a serious issue." Commonwealth v. Denis, 442 Mass. 617, 629 (2004). The analysis in this case, therefore, will turn on the "adequacy of the showing made with respect to that serious issue." Id. "Although the motions and supporting materials filed by a defendant need not prove the issue raised therein, they must at least contain

173

sufficient credible information to cast doubt on the issue." Id. "A judge may also consider whether holding a hearing will add anything to the information that has been presented in the motion and affidavits." Commonwealth v. Goodreau, 442 Mass. 341, 348 (2004). "If the theory of the motion ... is not credible or not persuasive, holding an evidentiary hearing ... will accomplish nothing." Id. at 348-349.

### 2. The Destruction of Witness Statements

This court, evaluated the issue of the destruction of witness statements during a voir dire prior to trial. This court found that one statement was in fact destroyed, and the defense was allowed to fully explore the contents of this statement before the jury. The defendant has not demonstrated any new evidence in regard to this issue, or how further investigation would aid his case. Finally, the defendant has provided no credible evidence that O'Connor was demoted, much less that he was demoted as a result of his actions in this case. In fact, the record shows that O'Connor received a promotion, not a demotion, to Sergeant prior to the trial of this case. The defendant has not provided sufficient credible information to cast doubt on this issue.

### 3. Alibi Witnesses

Although the defendant asserts that "numerous" alibi witnesses were prepared to testify that he was at home at the time of the murder, he has provided no credible evidence that such witnesses existed and were prepared to

174

testify or that his counsel knew or should have known of the existence of any such alibi witnesses.

In support of this portion of his motion, the defendant has provided an affidavit from the grandmother of his children, Violet Turner ("Turner"), who is prepared to testify that, on the night of the murder, she was at home watching the nightly news with the defendant and her daughter. The defendant has also produced an affidavit stating substantially the same thing. Both affidavits assert that the mother of the defendant's children was watching television with the affiants, but that she has since suffered a major loss of her mental abilities due to illness. Norris' affidavit also states that two persons, one named Keith and the other Sue, could have been located at the time of trial to testify to his whereabouts on the night of January 17, 2000. Norris says that he told his attorney that he wished to put forward an alibi defense.

In contrast, Turner told the police on January 20, 2000, that she had not seen Norris for the prior week to ten days. Based on this information, his attorney would have had no reason to investigate an alibi defense. See Denis, 442 Mass. at 629 (counsel is allowed to make reasonable decisions that make "particular investigations unnecessary"). Norris has not provided any evidence that his attorney had, at the time, any information that was in conflict with Turner's statement. Significantly, he has not provided an affidavit from his trial attorney, so the court has no way of knowing what his attorney may have known at the time. See Goodreau, 442 Mass. at 354 (in reviewing a motion for new trial "the judge may take into account the suspicious failure to provide pertinent

6

information from an expected and available source").  Further, other than Norris'

own self-serving and uncorroborated affidavit, he has provided no evidence that

any other alibi witnesses actually exist.  See Denis, 442 Mass. at 633; Wheeler

52 Mass. App. Ct. at 639 (a judge need not credit a defendant's unsubstantiated

and self-serving statements in support of a motion for new trial).  Finally, even if

the court credited Norris' assertion that such witnesses may exist, this assertion

is insufficient to create an adequate factual basis for his claim.  Figueroa, 422

Mass. at 77 ("The defendant must do more than allege that at a new trial he

might be able to call a witness who might be able to offer relevant, admissible

evidence").

### 4.  DNA Testing

Other than Norris' affidavit, which states that he "believes" material was

found under the victim's nails, the defendant has provided no evidence that any

testable material was found under the victim's fingerprints.  The defendant has

provided a copy of a property report which indicates that fingernail clippings were

taken from the body of the victim.  It does not say that material of any kind was

found under these nails.  The defendant has not provided sufficient credible

information to cast doubt on this issue.

### 5.  Remaining Factual Claims

The defendant further claims that he should be granted a new trial, or at

least funds to further investigate: 1) the age of cuts found on his hands; 2) the

time a shoeprint found outside the defendant's house; and 3) the time of the

basketball game watched by Johnson. The defendant has failed to provide any credible basis supporting a request for funds to investigate these claims. Nor has he demonstrated that any of these issues, if pursued, would provide any evidence that might cause this court to question the justice of the result at trial.

The lack of an affidavit from trial counsel stating that these avenues were not considered or investigated at the time of trial is highly suspicious. The defendant's own statement regarding how and when he got these cuts is both self-serving and uncorroborated. His explanation, that he cut his hands removing Christmas lights from his house a few days before the murder, was available to counsel at the time of trial. Presumably counsel was aware of the defendant's explanation and chose not to pursue it for strategic reasons. Further, even if the defendant could now show, based on an expert examination of photographs taken at the time that the cuts were, in fact, inflicted prior to the murder, he has not shown that this would have helped him at trial where numerous witnesses put him at the scene of the murder.

Regarding the shoeprint, defendant's appellate counsel states that the shoeprint could not have been caused by the defendant because it was made after a snowfall on January 20, 2000, after the defendant was already in custody. In support of this contention, the defendant presents something he found on the internet which appears to show that .08 of an inch of snow fell on the night of January 20. This piece of evidence seems to refer to snowfall in Taunton, not Springfield, Massachusetts. It further shows snowfalls on January 2, 3, 4, 10, 11 and 13, and no temperatures high enough to have melted the snowfall of the

177

8

13th. The evidence showed a number of footprints in snow outside the victim's house—a house located in the same city as the defendant's house. From this it is unclear why the court should believe that the shoeprint found outside the defendant's house could not have been placed prior to his arrest. Finally, even if the defendant could show definitively that this shoeprint was not his it would do nothing to overcome the overwhelming evidence against the defendant.

The defendant's final factual claim is that Johnson could not have watched the first three quarters of a basketball game before going out with defendant on the night of the murder. The defendant does not explain how this minor factual issue would serve to throw doubt on the defendant's conviction. He asserts that it would have provided impeachment evidence for his defense. Why this should be so is not clear to this Court. The witness may well have been mistaken about how much of the basketball game he had watched. It does not indicate that he lied. It also doesn't begin to undercut the heavy weight of other evidence against the defendant, or give this Court any reason to question the justice of the jury's verdict. Again, the defendant has failed to raise sufficient credible information to cast doubt on any of these issues.

### 6. Failure to Impeach With Prior Convictions

The defendant's failure to procure an affidavit from trial counsel is sufficient to dispose of this issue. Without such an affidavit, the defendant has simply failed to bring forward sufficient credible information that trial counsel declined to pursue this line of questioning for anything other than strategic reasons.

178

After a careful review of all the defendant's allegations, this court finds that the defendant has failed to make a substantial showing of raise a substantial issue supported by motion or affidavit raise a sufficient factual basis that would entitle him to a hearing. Nothing in the record indicates any errors on the part of the defendant's trial counsel, or that the defendant was prejudiced by anything trial counsel did or did not do. As such, defense counsel's representation cannot be viewed as incompetent.

Accordingly, because Norris to demonstrate that defense counsel's representation was ineffective and created a substantial risk of a miscarriage of justice, his motion for a new trial fails.

## ORDER

For the foregoing reasons, it is hereby **ORDERED** that the defendant's motion for new trial be **DENIED**.

Tina S. Page
Associate Justice of the Superior Court

DATED: 19 May 2005

179

10

$Ex$  "/."

## COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss

**TRIAL COURT**
**SUPERIOR COURT DEPARTMENT**
**INDICTMENT NO. 00-477**N  COUNTY
                         SUPERIOR  COURT
                              FILED

**COMMONWEALTH**                    OCT - 6 2005

vs.

**JAMES NORRIS**                    CLERK-MAGISTRATE

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO RECONSIDER

### INTRODUCTION

On November 7, 2001, a jury convicted the defendant, James Norris, of murder in the first degree committed with deliberate premeditation and with extreme atrocity and cruelty pursuant to G.L. c. 265, § 1. On November 12, 2003, the defendant moved for a new trial. This court denied the defendant's motion for a new trial on May 20, 2005. On June 3, 2005 the defendant submitted this motion to reconsider his motion for a new trial. For the reasons discussed below, the defendant's request for a new trial is **DENIED**.

The defendant now asks this court to reconsider its denial of his motion for a new trial on the following grounds. The defendant contends that his counsel was ineffective in failing to: 1) submit debris under the victim's fingernails to DNA testing, in order to prove that the victim had scratched someone besides the defendant on the night of the murder; 2) allow certain alibi witnesses to testify on the defendant's behalf; 3) admit evidence of snowfall in the Springfield area on

January 20 and 21, 2000, tending to show that a shoeprint found outside the defendant's home could not have belonged to the defendant; 4) retain an expert to investigate the age of the cuts on the defendant's hands; 5) impeach Johnson based on evidence regarding the time Johnson claimed he was watching a basketball game; and 6) impeach certain witnesses with prior convictions.

## A. DNA Testing

In denying the defendant's previous motion for a new trial, this court stated that the defendant failed to produce sufficient credible evidence that testable material was found under the victim's fingernails.  The defendant now presents this court with reports detailing the reliability of DNA evidence, and discusses certain scratches on Brunelle's face.  The defendant argues that DNA testing of the victim's fingernails would reveal Brunelle's DNA, thus exculpating the defendant.

The defendant, however, has not presented this court with sufficient credible evidence to cast doubt on this issue.  See Denis, 442 Mass. at 629 (2004).  Merely citing internet articles attesting to the reliability of DNA evidence, and pointing to a scratch on Brunelle's face, is not sufficient evidence for this court to order an evidentiary hearing or a new trial.[1]  Moreover, the jury heard evidence regarding the scratch on Brunelle's face from two witnesses, Freeman

---

[1] Additionally, the defendant submitted a Texas case to the Court in support of this argument. See Garcia v. Texas, 150 S.W.3d 598, 604-606 (2004). While the court in Garcia held that the defendant's DNA, found under the victim's fingernails, was sufficient evidence to sustain a conviction, the case is not controlling on this Court. Further, the circumstances and issues before the court in Garcia differ from those issues and circumstances before the Court in this case.

and Maria Santana ("Santana"), and thus, was able to consider this issue during the trial.

## B. Alibi Witnesses

In its memorandum and order on the defendant's motion for a new trial this court rejected the defendant's argument that his trial counsel was ineffective because he failed to pursue an alibi defense by presenting Violet Turner ("Turner") as an alibi witness. The defendant takes issue with this court's decision to deny his motion to dismiss, in part, because the defendant failed to provide an affidavit from his trial attorney regarding this issue. The defendant argues that requiring the defendant to provide such an affidavit from his trial counsel, who is allegedly ineffective, denies him of due process of law. However, the defendant cites no authority to support this position. In fact, case law in Massachusetts provides otherwise. In holding that the defendant failed to show that his trial counsel was ineffective in his motion for a new trial, the Supreme Judicial Court in Commonwealth v. Lynch noted: "It is significant that no affidavit from trial counsel was submitted in connection with Lynch's motion for a new trial." Commonwealth v. Lynch, 439 Mass. 532, 545 n. 2 (2003); see also Commonwealth v. Serino, 436 Mass. 408, 416 (2002).

## C. Remaining Claims

The defendant further contends that this court erred in denying his motion for a new trial when it found that trial counsel was not ineffective in failing to 1) investigate the cuts on the defendant's hands; 2) submit the weather report, in

248

correlation with the shoeprint, to the jury; 3) impeach Johnson on the time that he was watching the basketball game; and 4) impeach certain witnesses with prior convictions. In his motion the reconsider, the defendant fails to provide this court with any new credible evidence that would be sufficient to cast doubt on these issues.

This court, in its previous order, stated that the defendant failed to show how proof that the shoeprint was not his own would exculpate him in this case. In his motion to reconsider, the defendant fails to provide this court with any evidence on this issue. The defendant simply resubmits the same weather report as he submitted with is previous motion. Similarly, the defendant has failed to show how further evidence regarding the age of the cuts on his hands, or the time Johnson was watching the basketball game, would undermine the overwhelming evidence against him.

Finally, the defendant again argues that this court erred in putting so much weight on the fact that the defendant did not put forth an affidavit from his trial counsel. As discussed above, Massachusetts courts have held that in making an ineffective assistance of counsel argument in a motion for a new trial, it is significant when the defendant fails to submit an affidavit from trial counsel. See Lynch, 439 Mass. at 545 n. 2; see also Serino, 436 Mass. at 416. Without such an affidavit there is no way for this court to know the reasons why trial counsel decided to make certain tactical decisions.

After careful review of the defendant's motion to reconsider, this court finds that the defendant has failed to provide this court with sufficient credible

249

evidence to cast doubt on any issue.  In his motion to reconsider the defendant cites no new authority, does not submit an affidavit from his trial counsel, and makes the same unpersuasive arguments that failed him in his previous motion. Accordingly, the defendant's motion to reconsider fails.  The defendant is free to use his personal funds to obtain DNA testing if he so chooses.

## ORDER

For the foregoing reasons, it is hereby **ORDERED** that the defendant's motion to reconsider be **DENIED**.

Tina S. Page
Associate Justice of the Superior Court

DATED:  6 October 2005

250

5

**COMMONWEALTH OF MASSACHUSETTS**

HAMPDEN, ss.

**SUPERIOR COURT
INDICTMENT. NO.79 - 477**



**COMMONWEALTH**

vs.

**JAMES NORRIS**

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S SECOND MOTION FOR A NEW TRIAL

### INTRODUCTION

After a jury trial, the defendant, James Norris ("Norris"), was convicted of murder in the first degree committed with deliberate premeditation and with extreme atrocity and cruelty.  On November 7, 2001, this court imposed the mandatory sentence of life without the possibility of parole in Massachusetts Correctional Institution Cedar Junction.

The defendant now files his second motion for a new trial alleging ineffective assistance of counsel.  After an evidentiary hearing and for the reasons discussed below, the defendant's motion is **DENIED**.

### PRIOR PROCEEDINGS

On March 7, 2000, a Hampden County grand jury indicted the defendant, James Norris, for the murder of Aaron Scott.  The defendant was charged with murder pursuant G.L. c. 265 § 1.  The defendant was arraigned in the Superior Court on March 21, 2000.  On October 25, 2001, the case was sent to my session for trial.  On

308

November 5, 2001 during the course of the trial, his attorney, Donald Frank, ("Frank" or "trail counsel") informed me that he and Norris were having a dispute, at which point I took a recess to allow Frank and Norris to discuss these issues. At the request of trial counsel, a record of that conversation was created during the recess. The trial proceeded without any further indication from Frank or Norris of any additional disputes or problems.[1]

On November 8, 2001, Norris filed his first notice of appeal. On November 12, 2003, the defendant submitted a motion for a new trial alleging ineffective assistance of counsel. The motion was denied by me on May 20, 2005. On June 3, 2005, the defendant then submitted a motion for reconsideration the denial of his first motion for new trial, which was denied on October 6, 2005. Additionally, the defendant's motion for DNA testing of the material found under the victim's fingernails was allowed by me on February 9, 2006. Norris submitted a second motion for a new trial on June 23, 2016, which was remanded for disposition to the trial court on December 5, 2016 by the Supreme Judicial Court. An evidentiary hearing for the second motion for new trial was held on February 13 and February 14, 2018.

---

[1] A member of the bar since 1986, Frank testified in the evidentiary hearing that this was his first murder trial. Frank did not recall the theory of the defense. He did recall the issue that led to their dispute involved calling Norris' girlfriend as a witness at trial. Norris insisted on not calling his girlfriend as a witness in the case. Frank, in preparing for trial, relied on that witness to establish an alibi for Norris. Yet Norris was emphatic and insisted that this witness not be called to testify at trial. Frank credibly testified that he did not take notes of his interview with her.

2

## BACKGROUND

The facts presented at trial were as follows.

On January 17, 2000, Norris called a friend, Dan Brunelle ("Brunelle") and asked him for a ride.  After Brunelle picked up Norris in his van, the two drove to the house of another friend, David Johnson ("Johnson") at 51 Brickett Street.  Johnson testified that he had been watching the third quarter of a basketball game between the San Antonio Spurs and the Los Angeles Clippers when Brunelle and Norris picked him up.  The three men then drove to the victim, Aaron Scott's ("Scott"), house at 81 Brickett Street.  Norris and Johnson went into the house while Brunelle waited outside in his van.  Some time thereafter a fight broke out in the house.  Brunelle and Johnson testified that Johnson stood against the door during the purported altercation taking place inside the victim's house.  Shortly after the altercation inside 81 Brickett Street began, Brunelle got into his van and drove to another house occupied by Charles Varner ("Varner"), located at 28 Woodcliff Street.  There Brunelle spoke with two men, Keith Freeman ("Freeman") and Varner, and told them about the fight that had occurred between Norris and the victim.  Freeman and Varner went to the victim's house and saw the defendant coming from a field near the victim's house.  The defendant told them there had been a "tussle" and that they should leave.  Consequently, Freeman and Varner left briefly, but immediately returned and, over the defendant's objections, entered the victim's house.  There Freeman and Varner saw the victim's body on the basement stairs.  Varner and Freeman left the house and made several calls to the police afterwards.

At some point after the murder, the defendant told another person, Bernard Williams ("Williams") that he had killed the victim because the victim owed him money

3

and had been disrespecting him.  Prior to trial, evidence came to light that two

witnesses, Johnson and Williams, may have produced statements indicating that they

knew nothing about the murder.  These statements were allegedly destroyed by an

investigating officer, Detective (now Sergeant) Dennis O'Connor.  After the hearing, the

court found that such statement had been produced by Williams and destroyed by

O'Connor, but that no such evidence existed in regard to Johnson.  The jury heard

testimony regarding the contents of Williams' destroyed statement.  At trial, Norris'

counsel told the jury that the defendant had stumbled upon the body when he went to

the house to conclude a drug deal and had been accused only because Brunelle and

Johnson had seen him at the scene.

## DISCUSSION

The defendant has raised six separate bases for his claim of ineffective

assistance of counsel.  He asserts that counsel was ineffective by: 1) not reviewing

photographic evidence of the crime scene with a criminalist; 2) not investigating

footprints purportedly tying the defendant to the crime scene; 3) failing to raise the

possibility that other parties were at the house at the time of the murder; 4) not testing

the material found under the victim's fingernails; 5) failing to offer Rico or unknown

parties from New York City as possible culprits of the murder; and 6) not offering that

police first went to the scene responding to a disturbance call and found no blood or

evidence of violence at that time, but returned several hours later to a crime scene.

### I.    The Standard of Review

"A trial judge may grant a new trial any time it appears that justice may not have

been done."  Commonwealth v. Cintron, 435 Mass. 509, 516 (2001), citing Mass. R.

4

311

Crim. P. 30 (b).  "Judges . . . should only grant such a motion if the defendant comes forward with a credible reason which outweighs the risk of prejudice to the Commonwealth."  Commonwealth v. Wheeler, 52 Mass. App. Ct. 631, 636 (2001).

"In a new trial motion asserting ineffective assistance of counsel, whether justice may not have been done equates with whether counsel was constitutionally ineffective." Id.  The defendant bears a heavy burden in establishing ineffective counsel. Commonwealth v. Brookins, 33 Mass. App. Ct. 626, 631 (1992), rev'd on other grounds, 416 Mass. 97 (1993).  To support such claims, the defendant must show "serious incompetency, inefficiency or inattention of [his] counsel – behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer – and . . . [that such inadequacies] likely deprived [him] of an otherwise available substantial ground of defence."  Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).  The burden is on the defendant to demonstrate that the alleged errors possibly weakened his case in some significant way as to require a new trial.  See Commonwealth v. Schulze, 389 Mass. 735, 741 (1983).

## II.   Failure to Test Material Found Under Victim's Fingernail

Norris claims that trial counsel was ineffective for failing to have the substance found under the victim's fingernails tested.  Norris argued this issue in his first motion for a new trial and the court subsequently allowed Norris's motion to conduct DNA testing of material found under the victim's fingernails.  As presented during the evidentiary hearing on this second motion for new trial, the testing revealed that the only DNA present under the fingernails belonged to the victim.  There was no substance detected that could have been attributed to a known or unknown third party.  Unlike cases where

DNA results exclude a defendant as an unknown donor, these results do not support a finding of substantial risk that the jury would have reached a different conclusion had the results been available at trial.  See Commonwealth v. Cameron, 473 Mass. 100, 102 (2015) (finding there was a substantial risk that the jury would have reached a different conclusion where new evidence showed the unknown secondary source of donor DNA conclusively excluded the defendant as a possible donor).  Though the better practice would have been for trial counsel to have the fingernails tested for DNA, trial counsel's failure to have testing performed did not deprive the defendant of an otherwise available, substantial ground of defense and does not amount to constitutionally ineffective assistance, as these results are insufficient to cast meaningful doubt on the guilty verdict rendered by the jury.  See Commonwealth v. Saferian, 366 Mass. at 96.

**III.   Remaining Claims**

The defendant's remaining arguments are assertions that trial counsel: 1) did not review photographic evidence of the crime scene with a criminalist; 2) lapsed in investigating the footprint purportedly tying the defendant to the crime scene; 3) failed to raise the possibility of other parties at the house at the time of the murder; 4) failed to offer Rico[2] or unknown parties from New York City as possible culprits of the murder; and 5) failed to offer that police first went to the scene responding to a disturbance call and found no blood or evidence of violence at that time but returned several hours later to a crime scene.

Where a defendant has brought a prior motion for new trial, under Mass. R. Crim. P. 30 (c) (2) "all grounds for relief claimed by a defendant . . . shall be raised by the

---

[2] Rico is the victim's brother who had also resided at 81 Brickett Street with the victim and has "disappeared" since January 2000.

6

defendant in his original or amended motion.  Any grounds not so raised are waived

unless the judge in his discretion permits them to be raised in a subsequent motion, or

unless such grounds could not reasonably have been raised in the original or amended

motion."  Rodwell v. Commonwealth, 432 Mass. 1016, 1017 (2000).  The concern for

finality demands that a defendant present every claim and argument he might fairly

have had available to him the first time around, and not after the proceeding has run its

course.  Commonwealth v. Amirault, 424 Mass. 618, 639 (1997).

All of the defendants remaining claims could have reasonably been raised in the

prior motion for new trial.  I consider these claims to be waived and do not address them

on their merits, only to determine whether a substantial risk of miscarriage of justice

might otherwise result from their waiver.  See Commonwealth v. Oliveira, 431 Mass.

609, 612 (2000); Commonwealth v. Hallet, 427 Mass. 552, 555 (1998).  A substantial

risk of a miscarriage of justice exists if there is serious doubt as to whether the outcome

of the trial might have been different if the alleged errors had not occurred.

Commonwealth v. Navarro, 474 Mass. 247, 254 (2016).  "Errors of this magnitude are

extraordinary events and relief is seldom granted."  Commonwealth v. Randolph, 438

Mass. 290, 297 (2002).

### A. Criminalist

The defendant argues that trial counsel should have hired a criminalist to review

pictures of allegedly bloody handprints on a dresser at the crime scene in order to argue

that this evidence was inconsistent with the Commonwealth's theory of the case and more

consistent with a theory that a third-party ransacked the apartment and killed the victim.

This argument is purely speculative, as the defendant offers no support for his contention

7

that evidence of the handprints would actually be inconsistent with his having committed the crime.  Presenting the possibility that a third party could have committed the crime while ransacking the house would not likely have changed the outcome at trial, particularly where the defendant already presented a more significantly developed third-party killer defense.

### B. Footprint Investigation

The defendant asserts that trial counsel should have investigated the footprints at the scene and argued that they didn't match his own from his Wilbraham Avenue home, that the outdoor footprints occurred after he was in custody, and that the presence of indoor footprints contradicted testimony that the defendant had cleaned up inside the house.  Testimony from the defendant's expert, Dr. Alicia Wilcox, during the evidentiary hearing was far from conclusive on these points.  However, even if counsel had been able to present such evidence to the jury, it would not have been enough to change the outcome of the trial, as the Commonwealth did not rely primarily upon the footprints to establish the defendant's presence at the scene, or even argue that they were an actual match.  The defendant's presence at the scene was established through testimony from multiple eye-witnesses.  Additionally, Johnson, Freeman, and Varner testified that they had entered the house at different points, and the jury already could have inferred that the footprints did not necessarily belong to the defendant.

### C. Third Party Defense

The defendant contends that trial counsel should have pursued a defense presenting the possibility that either Rico or unknown third parties from New York City murdered the victim.  Trial counsel already presented a third-party killer theory at trial by

8

attempting to implicate Brunelle and Johnson in the murder. That defense was unsuccessful and the defendant points to nothing indicating that the outcome of the trial would have been different had counsel advanced third-party theories regarding individuals even more attenuated from the scenario than Brunelle and Johnson. The evidence that other cars were parked at the house also would not likely have changed the outcome of the trial, for the same reasons.

### D. Police Arrival at Scene

Finally, despite the defendant's contention, the evidentiary hearing testimony of Officer Lawrence Pietrucci Jr., who initially responded to the scene around midnight on the night of the murder before the discovery of the victim's body around 3:40 a.m., would not have changed the outcome at trial. The officer testified that he and his partner first responded around midnight and found nothing to be out of the ordinary, however, there was blood found on the back door when they returned around 3:40 a.m. after a second call came in regarding a disturbance at the victim's home. Had such testimony been introduced, the jury could have inferred from the evidence at trial that the defendant committed the crime and left the scene only to return to the scene later and transfer the blood to the door and snow at that time. The inclusion of the testimony would not have changed the outcome of the trial, as it would be consistent with the testimony of multiple witnesses.

As such, I conclude there is no substantial risk of a miscarriage of justice from the defendant's waiver of these claims, as there is no "serious doubt as to whether the outcome of the trial might have been different" if any of these bases had been advanced at trial. See Navarro, 474 Mass. at 254.

9

## ORDER

For the foregoing reasons, it is hereby **ORDERED** that the Defendant's Motion

for New Trial is **DENIED**.


Tina S. Page
Justice of the Superior Court


DATED:   22 May 2018

5/22/18 Copy A.D.A. Amal Bala

Copy Mailed : Atty. David Erickson
570 Massachusetts Ave.
Acton, MA 01720

Copy Mailed : Atty. David L. Larson
741 Broadway St
Somerville, MA 02144
T.N.

10

317

NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-08998

COMMONWEALTH  vs.  JAMES NORRIS.


Hampden.        September 10, 2019. - December 20, 2019.

Present:  Gants, C.J., Lowy, Cypher, & Kafker, JJ.


Homicide.  Constitutional Law, Assistance of counsel.  Evidence,
    Exculpatory, Third-party culprit, Alibi.  Practice,
    Criminal, Capital case, Required finding, New trial,
    Assistance of counsel, Preservation of evidence,
    Disqualification of judge.



Indictment found and returned in the Superior Court
Department on March 7, 2000.

The case was tried before Tina S. Page, J.; a motion for a
new trial, filed on November 12, 2003, was considered by her;
and a motion for a new trial, filed on June 23, 2016, was heard
by her.


David H. Erickson for the defendant.
Joseph G.A. Coliflores, Assistant District Attorney, for
the Commonwealth.


CYPHER, J.  On November 7, 2001, the defendant, James

Norris, was convicted of murder in the first degree on theories

of premeditation and extreme atrocity or cruelty in the stabbing

death of the victim, Aaron "Chad" Scott.  The defendant's direct appeal was consolidated with his appeals from the denials of his two motions for a new trial.  The defendant raises various arguments on appeal.  He asserts that his motion for a required finding of not guilty should have been granted; that he received ineffective assistance of counsel; and that the trial judge erred in admitting improper and misleading evidence, failing to sanction the Commonwealth appropriately for destroying exculpatory evidence, and failing to recuse herself.  Finally, the defendant argues that the cumulative errors made during the trial amount to a violation of due process and his right to a fair trial.

After careful consideration of the defendant's arguments on appeal from his conviction and from the denials of his two motions for a new trial, we affirm his conviction and the denials of the motions, and we decline to grant extraordinary relief pursuant to G. L. c. 278, § 33E.

Background.  We recite the facts the jury could have found, viewing the evidence in the light most favorable to the Commonwealth, while reserving certain details for later discussion.

The defendant lived with a relative on Wilbraham Road in Springfield.  The defendant sold drugs for the victim and his brother, who sublet a home on Brickett Street in Springfield

from the defendant.  The victim's body was found in the early
morning hours of January 18, 2000, in the Brickett Street home
(house) after four anonymous 911 calls directed police to the
residence.

The previous evening, at approximately 10:30 $\underline{P}.\underline{M}$., the
defendant telephoned Dan Brunelle, a casual associate, to ask
for a ride to the house.  Brunelle had driven the defendant to
the house many times before because Brunelle occasionally
purchased "crack" cocaine from the defendant or the victim.

When Brunelle arrived to pick up the defendant twenty
minutes later, the defendant got into Brunelle's van and said,
"I'm going to do Chad."  After convincing Brunelle that he was
joking, the defendant asked Brunelle to stop a few doors away
from the house to pick up David Johnson, whom the defendant had
invited along to smoke marijuana.[1]  During the drive, Brunelle
complied with the defendant's request to lend Johnson his
gloves, but once they arrived at the house Brunelle became
nervous about the defendant's earlier "joke."  He got out of the
van, stood by the front bumper, and demanded his gloves back.

Brunelle remained in the van while the defendant and
Johnson approached the house.  Brunelle saw the pair enter the

---

[1] The defendant and David Johnson previously sold drugs
together, became friends, and resumed a drug business when
Johnson was released from prison.

home, and a silhouette of a third person in the kitchen.
Brunelle testified that a moment later, Johnson "burst out"
through the storm door, turned around, and put his full weight
against the door, "containing what was clearly a struggle on the
inside." In a panic, Brunelle drove away to the home of Charles
Varner, whom Brunelle considered a brother-in-law.

Johnson testified that when he entered the home behind the
defendant, the defendant and victim had already begun to fight.
During that fight, the two men fell against the storm door,
which swung open and hit Johnson in the face. After pushing the
door shut, Johnson heard the victim say, "Are you going to leave
me for dead? Are you going to leave me for dead? I got kids .
. . I got little boys," but all Johnson could see was the
defendant's arm making "up and down" movements. As Johnson
backed away from the door, it "flew open," and the defendant
called out to Johnson for help with the victim's body. Shocked
and believing the defendant had a knife on him, Johnson remained
at the scene, where he witnessed the defendant try to push the
victim's body down a flight of stairs before taking a pot of
water that was on the stove and splashing it throughout the
kitchen and the exterior of the home.

Once Johnson left the scene, the defendant followed.
Johnson testified that after going to a bar to get change, the
defendant used a pay telephone to call someone to help him

dispose of the body and clean up.  As Johnson and the defendant returned to the scene, Johnson saw a vehicle in the driveway.

Inside the vehicle were Varner and his friend, Keith Freeman, who had arrived at the house after Brunelle had told the men what he had witnessed.  Varner testified that when he and Freeman initially arrived at the scene, Varner knocked on the door, but no one answered.  As he turned to get back into his vehicle, he saw the defendant, who told him to leave.  When Varner informed the defendant that Brunelle had been to his house and that he was there to see "what was going on," the defendant told Varner that Brunelle was a liar, that there had been "a little beef," and that the police had already been there.

Varner and Freeman began to drive away but then turned around after deciding that things did not "seem right."[2]  When they returned, Varner demanded to know where the victim was.  The defendant claimed that the victim was not there.  Despite the defendant's protests, Varner and Freeman entered the home and saw the victim's jacket in the kitchen.  Again, Varner

---

[2] Johnson testified that he watched this interaction between the defendant and a man in a vehicle.  Once Johnson observed the vehicle leave and return, he fled the scene and went to his mother's house.  A short time later, the defendant arrived again, asking Johnson to help him dispose of the body.  After Johnson refused, he and the defendant had no further communication that evening.

demanded to know where the victim could have gone without a jacket, and Varner and Freeman began to go from room to room, "yelling" the victim's name.  While they searched the house, the defendant followed closely behind, pleading with them to leave.

As they again passed through the kitchen, Varner noticed for the first time what he believed to be a bloody fingerprint on the wall.  At some point, Varner and Freeman walked past the door to the basement stairs.  When they looked down, they discovered the bloody body of the victim.  Varner told the defendant that he was calling the police before he and Freeman left the scene.  Varner placed his first telephone call to 911 at 11:42 P̲.M̲.

At approximately 3 A̲.M̲. on Tuesday, January 18, 2000, the defendant contacted a friend, Bernard Williams, and asked him to come over to his house.  The defendant confessed to Williams that he had stabbed the victim to death and had thrown his body down the stairs.  Williams testified that the defendant killed the victim because "things had built up for a long time . . . [t]hey weren't treating him right . . . it was over money and disrespect."

At the close of the Commonwealth's case, the defendant's motion for a required finding of not guilty due to insufficient evidence was denied.  The jury found the defendant guilty of

murder in the first degree on theories of premeditation and extreme atrocity or cruelty, and the defendant appealed.

After entry of the defendant's appeal in this court, he filed a motion for a new trial asserting that his trial counsel had been ineffective for failing to investigate and use an alibi defense and forensic evidence, and for failing to impeach a key witness for the Commonwealth.[3]  The motion judge, who also was the trial judge, denied that motion without a hearing, and she also denied the defendant's motion for reconsideration without a hearing.  The defendant appealed from the denial.

After filing a motion for deoxyribonucleic acid (DNA) testing, which was granted, the defendant filed a second motion for a new trial.  After an evidentiary hearing, the defendant's motion was denied.  He appealed, and that appeal was consolidated in this court with the appeal from his conviction and with the appeal from the denial of his first motion for a new trial.

Discussion.  1.  Denial of motion for a required finding of not guilty.  The defendant argues he was entitled to a not guilty verdict as a matter of law because there was legally

---

[3] The defendant's motion contained a request for funds to investigate and locate individuals supporting his alibi defense, to obtain a criminalist to review photographic and shoeprint evidence, and to test any material found under the victim's fingernails.

insufficient evidence connecting him to the crime.
Specifically, he argues that the lack of forensic evidence -- no
murder weapon was found, no DNA linked the defendant to the
crime, and there was no definitive shoe print match --
"vindicate[s]" him in the face of "the testimony of professed
crack cocaine addicts or others with a motive to lie."

This court must determine whether the evidence was
sufficient to satisfy a rational trier of fact of each element
of the crime beyond a reasonable doubt.  Commonwealth v.
Latimore, 378 Mass. 671, 677-678 (1979).  "The relevant question
is whether the evidence would permit a jury to find guilt, not
whether the evidence requires such a finding." Commonwealth v.
Brown, 401 Mass. 745, 747 (1988).  The evidence against the
defendant was substantial.  Two witnesses placed the defendant
at the scene of the crime, one of whom effectively witnessed the
defendant murder the victim.  Two other witnesses arrived on the
scene as the defendant was attempting to dispose of the body or
otherwise cover up the crime.  A fifth witness testified that
the defendant confessed to committing the murder a few hours
after the crime took place.

"Once sufficient evidence is presented to warrant
submission of the charges to the jury, it is for the jury alone
to determine what weight will be accorded to the evidence."
Commonwealth v. Ruci, 409 Mass. 94, 97 (1991), quoting

Commonwealth v. Hill, 387 Mass. 619, 624 (1982).  While the
defendant portrays these witnesses as untrustworthy addicts,
"[c]redibility is a question for the jury to decide; they may
accept or reject, in whole or in part, the testimony presented
to them."  Commonwealth v. Fitzgerald, 376 Mass. 402, 411
(1978).  The defendant's claim that the testimony of the
witnesses at his trial "was inherently unreliable is nothing
more than an issue of credibility, an issue that is solely
within the province of the jury."  Commonwealth v. James, 424
Mass. 770, 785 (1997).  There was no error.

    2.  Ineffective assistance of counsel.  In this
consolidated appeal, the defendant raises the same ineffective
assistance of counsel arguments asserted in his motions for a
new trial.  We review the defendant's claim of ineffective
assistance of counsel under G. L. c. 278, § 33E,[4] which provides
a standard of review more favorable than the constitutional
standard of review of such claims.  See Commonwealth v. Wright,
411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).
Accordingly, we determine "whether there was an error in the
course of the trial (by defense counsel, the prosecutor, or the
judge) and, if there was, whether that error was likely to have

---

    [4] The defendant incorrectly states that his motions for a
new trial were entitled to plenary review by the motion judge
pursuant to G. L. c. 278, § 33E.  This is inaccurate.  However,
the defendant is entitled to plenary review by this court.

influenced the jury's conclusion." <u>Wright</u>, <u>supra</u>.  "Where, as
here, the trial judge also considered the motion for a new
trial, we extend 'special deference' to the judge's action on
the motion" (citation omitted).  <u>Commonwealth</u> v. <u>Barnett</u>, 482
Mass. 632, 638 (2019).

    a.  <u>Failure to impeach the Commonwealth's theory or
timeline of events</u>.  The defendant argues that trial counsel
failed to impeach the Commonwealth's theory of events using two
key pieces of evidence:  photographs of a dresser with bloody
handprints located at the scene and Johnson's testimony that he
was watching the third quarter of a televised professional
basketball game when the defendant arrived to pick him up.

    The defendant suggests that the photographs of the dresser
demonstrate that "the house was searched, and that whoever did
this appears to have left the property with great dispatch,"
thereby contradicting the Commonwealth's theory that the
defendant killed the victim and remained at the scene for some
time afterward.  Further, the defendant asserts that this
evidence contradicts the Commonwealth's "strong inference . . .
that Norris was wearing gloves."

    As the motion judge noted, "[t]his argument is purely
speculative, as the defendant offers no support for his
contention that evidence of the handprints would actually be
inconsistent with [the defendant] having committed the crime."

The first 911 call reporting a disturbance occurred at 11:42 P.M.  Police did not secure the crime scene until after the third 911 call was made after 3:30 A.M.  Therefore, the victim was immobile in his home for over three hours.  The possibility that an unknown third party could have entered and ransacked the home during that time does not preclude the jury from finding that the defendant committed the murder.  This evidence is unlikely to have influenced the jury's conclusion in any way.

The defendant also cites his trial counsel's failure to impeach a key prosecution witness, Johnson, who testified that he was watching a basketball game when the defendant picked him up to go to the victim's home.  When asked if he remembered what time the defendant picked him up, Johnson testified, "It was at night, about -- I know it was a double basketball game that day, but I don't remember what time it was.  It was the Spurs they were playing, I know that much."  When asked if he remembered at approximately what part of the basketball game the defendant arrived, Johnson responded, "Yes, almost the end of the third quarter."  The defendant argues that after trial, it was determined that the basketball game Johnson referred to "began at 9:30 P.M. San Antonio time, later Springfield time, and ran two hours and 14 minutes."  Thus, Johnson could not have been watching this game until the end of the third quarter and been with the defendant at the time of the killing.

"Generally, failure to impeach a witness does not amount to ineffective assistance of counsel." Commonwealth v. Fisher, 433 Mass. 340, 357 (2001). Even using the more favorable standard of review under § 33E, a claim of ineffective assistance based on failure to use particular impeachment methods is difficult to establish. Id. "Trial counsel does not necessarily provide ineffective assistance by 'not prob[ing] every inconsistency" (citation omitted). Commonwealth v. Jewett, 442 Mass. 356, 363 (2004). "[A]bsent counsel's failure to pursue some obviously powerful form of impeachment available at trial, it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion." Commonwealth v. Hudson, 446 Mass. 709, 715 (2006), quoting Fisher, supra. Here, impeachment as to the timing of the basketball game was unlikely to have influenced the jury, given that Brunelle testified that he brought the defendant and Johnson to the victim's house sometime after 10:30 P.M.[5]

---

[5] The defendant argued in his first motion for a new trial that "trial counsel was ineffective in impeaching Commonwealth witnesses with prior convictions." This claim has no merit. The defendant fails to identify which witness he is referring to or the nature of the convictions. Additionally, the Commonwealth's key witnesses all testified to current or former drug use, and the defendant has failed to establish how the introduction of a prior conviction would have influenced the jury.

b.  <u>Failure to properly investigate forensic evidence</u>.  The
defendant argues that trial counsel failed to properly
investigate and use two significant pieces of forensic evidence:
the defendant's alleged footprint at the scene of the crime and
DNA material found under the victim's fingernails.

At trial, a State trooper testified about numerous
footprints that were found at the crime scene.  She stated that
a footprint that was found outside the house where the defendant
was living was "consistent in tread pattern and overall physical
size and shape" to footprints found at the Brickett Street
house, allowing an inference that the footprints at the scene
belonged to the defendant.  The defendant maintains that if
trial counsel had sought and obtained an expert in footprint
evidence, he would have discovered that the footprint "was very
far from a match."  Such evidence was unlikely to have
influenced the jury.  First, numerous witnesses placed the
defendant at the house and at least one saw the defendant in a
struggle with the victim.  Second, through cross-examination,
trial counsel made the point that no footprints from anywhere
matched a pair of sneakers that police had taken from the
defendant.  Finally, this footprint evidence was not a
substantial component of the Commonwealth's case.[6]  In closing

_____

[6] The Commonwealth made no mention of the footprints in its
opening statement.  In closing argument, the Commonwealth

argument, the prosecutor cautioned the jury, "So, the footwear evidence in this case is not evidence that you should rely upon exclusively to reach some finding of guilt, but it is consistent, it is corroborative of the remainder of the evidence."[7]

The defendant also argues that trial counsel was ineffective for not testing the material found under the victim's fingernails.  As presented during the evidentiary hearing on the second motion for a new trial, the testing revealed that the only DNA present under the victim's fingernails belonged to the victim himself.  There was no DNA detected that could be attributed to a known or unknown third party.  Had these results been presented at trial, they would not have influenced the jury's verdict.  Contrast Commonwealth v. Cameron, 473 Mass. 100, 102 (2015) ("the newly available DNA evidence that conclusively excludes the defendant as a possible

---

devotes only two sentences to this footprint:  "There is another set of prints outside the [Brickett Street] house.  They are consistent with a print found at the defendant's home, outside of the defendant's home . . . ."

[7] In his first motion for a new trial, the defendant also argues that an expert should have been used to examine photographs of cuts on his hands, which he claimed resulted from removing Christmas lights.  The defendant has not shown that this would have helped him at trial where four witnesses put him at the scene of the murder.

donor likely would have been a real factor in the jury's
deliberations").

    c.  <u>Failure to investigate alternative theories or
suspects</u>.  The defendant alleges trial counsel failed to
investigate a variety of alternative theories and suspects.
First, he argues that trial counsel did not offer evidence that
police responded to the house to a report of a disturbance
before the response when the victim was discovered and that, at
that time, they found no blood or evidence of violence.  At the
hearing on the defendant's second motion for a new trial one of
the police officers who had responded to the earlier call about
this disturbance testified to details of what he and his partner
did (i.e., checked the doors, walked around the house).

    We begin by noting that, at trial, a police officer who had
responded to the house when the victim was found testified that
there had been an earlier call to which officers had responded
but had found nothing.  Thus, this information was before the
jury.  In any event, it is unclear how this evidence casts doubt
on the Commonwealth's theory of the crime.  As the motion judge
observed, "Had such testimony been introduced, the jury could
have inferred from the evidence at trial that the defendant
committed the crime and left the scene only to return to the
scene later and transfer the blood to the door and snow at that
time."

Second, the defendant asserts that trial counsel did not introduce evidence of other parties with possible motives to kill the victim, including unknown drug associates from New York City and the victim's own brother, Rico, who apparently disappeared after the murder.  Third, the defendant asserts that trial counsel failed to address the additional vehicles parked at the home on the night of the crime, as well as a tire track found then.

Defense counsel did present a third-party killer theory at trial by attempting to implicate two of the Commonwealth's key witnesses -- Brunelle and Johnson.  However, typically, we do not characterize strategic decisions as ineffective assistance merely because they prove unsuccessful.  See Commonwealth v. White, 409 Mass. 266, 272 (1991).  We agree with the judge that the defendant has failed to identify any material evidence trial counsel would have discovered had he pursued these additional suspects; that there is nothing to indicate the outcome of trial would have been different had counsel advanced these other third-party culprits, who were "even more attenuated from the scenario than Brunelle and Johnson[; and that t]he evidence that other cars were parked at the house also would not likely have changed the outcome of the trial, for the same reasons."  It was hardly unreasonable for trial counsel to focus on the witnesses who identified the defendant as the murderer, rather than

unidentified individuals or vehicles, in formulating a third-party culprit defense.

  d. <u>Failure to explore an alibi defense</u>.  The defendant argues that trial counsel "abandoned a possible alibi defense by not investigating the matter."  In support of his first motion for a new trial, the defendant provided an affidavit from the grandmother of his children, who was prepared to testify that, on the night of the murder, she was at home watching the nightly news with the defendant and her daughter.  The defendant also submitted an affidavit asserting the same thing and naming two persons, "Keith" and "Sue" (no last names provided), who "could have been located" at the time of trial to testify to his whereabouts on the night of the murder.[8]

  The decision of defense counsel regarding the best defense to pursue at trial is a tactical one and will not be deemed ineffective unless manifestly unreasonable when made. <u>Commonwealth</u> v. <u>Vao Sok</u>, 435 Mass. 743, 758 (2002).  "A strategy is manifestly unreasonable if 'lawyers of ordinary training and skill in the criminal law would [not] consider [it] competent.'" <u>Commonwealth</u> v. <u>Velez</u>, 479 Mass. 506, 512 (2018), quoting

---

  [8] In his affidavit, the defendant identifies "Keith" only as someone "who drove a white van" and "Sue" as someone who "lived on State Street in Springfield, Massachusetts, next to the Getty gas station and worked . . . at Springfield Technical Community College for the dean or registrar."

Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015), S.C., 478 Mass. 189 (2017).

According to an investigative report submitted with the defendant's first motion for a new trial, the grandmother told a police officer that she had not seen the defendant for from one week to ten days prior to the crime, "as he had moved out and was no longer staying with her."  However, at trial, Brunelle testified that he picked up the defendant from the grandmother's home.  Given these inconsistencies, it was not unreasonable for trial counsel to decline to rely on the grandmother's testimony to establish an alibi defense.[9]  Nor was it unreasonable for trial counsel to decline to investigate "Keith" or "Sue" when the defendant could not provide a last name or other relevant information about these unknown parties.[10]

3.  Admission of alleged unduly prejudicial evidence.  At trial, the Commonwealth presented the results of preliminary orthotolidine testing, which indicated the presence of blood in

_____

[9] At an evidentiary hearing on the defendant's second motion for a new trial, trial counsel could not recall much about the case.  He did recall that in preparing for trial, he relied on the defendant's girlfriend as a witness to establish an alibi. However, when the time came to call her at trial, the defendant insisted that she not be called to testify.

[10] The defendant did not provide any additional information about "Sue" or "Keith" in his second motion for a new trial; nor did he provide affidavits from them indicating what they would have testified to had they been called.

the vehicle that the defendant used to leave the crime scene.
Subsequent testing did not show the presence of blood.  The
defendant argues that these results were irrelevant and unduly
prejudicial, and that the jury were left with the impression
that there was evidence of blood in the vehicle.  The
Commonwealth concedes that there was no overt relevance to the
presence of stains in the vehicle as presented by an expert, but
argues that "the evidence is relevant to show steps taken in the
investigation."

The defendant did not object at trial to the admission of
the preliminary testing.  Thus, we review the issue to determine
whether there was an error, and if so, whether it resulted in a
substantial likelihood of a miscarriage of justice.  See
Commonwealth v. Javier, 481 Mass. 268, 287 (2019).

This court already has held that the results of
orthotolidine testing is permissible without the need for
further confirmatory evidence.  Commonwealth v. Duguay, 430
Mass. 397, 401-402 (1999).  In Duguay, the court stated that
there was no undue prejudice because the chemist informed the
jury that the test was presumptive, and she "acknowledged a long
list of substances other than human blood that could yield a
positive result."  Id. at 402.  Additionally, "[d]efense counsel

freely and repeatedly pointed out the limitations of the test."
Id.[11]

Here, trial counsel elicited on cross-examination that the
test was an initial screening test requiring further
confirmation for accuracy; that it could yield false positives,
which can result from metals, vegetable products, or rust; and
that all four wheel wells on the vehicle were rusted.  The
expert also confirmed that subsequent testing was negative and
that no further tests were performed.  In closing, defense
counsel emphasized the significance of this testimony, arguing,
"And when he takes that swab of what he thinks is the blood,
there may be false positives.  As I have already said, it comes
up negative for blood.  It wasn't blood.  And if it was blood or
if they didn't trust the confirmatory test which came up

---

[11] Moreover, although subsequent testing revealed that there
was no blood present, the preliminary results are still relevant
-- albeit limited, given defense counsel's repeated attempts to
challenge the adequacy of the police investigation.  See
Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980).
"'Evidence does not have to be conclusive of an issue to be
admissible'; admissible evidence may simply make [the]
Commonwealth's contention more probable than it would be without
that evidence."  Commonwealth v. Javier, 481 Mass. 268, 288
(2019), quoting Commonwealth v. Pytou Heang, 458 Mass. 827, 851
(2011).  The fact and manner in which the preliminary testing
was done provided the jury with information from which they
could have inferred that it was more likely that the criminal
investigation was adequate, despite defense counsel's closing
argument to the contrary.  See Commonwealth v. Avila, 454 Mass.
744, 753 (2009) (Commonwealth has right to rebut Bowden
defense).

negative for blood, they would have done a third test.  But they
didn't."  The Commonwealth did not reference the testing done on
the vehicle in its closing.

We conclude that there was no error, but even if there was,
given trial counsel's effective cross-examination and closing
argument,[12] the admission of the orthotolidine testing did not
create a substantial likelihood of a miscarriage of justice.

    4.  Commonwealth's alleged destruction of exculpatory
evidence.  The defendant argues that the judge erred in failing
to sanction the Commonwealth for the alleged destruction of two
pieces of exculpatory evidence.  The defendant asserts that
Johnson initially made a handwritten statement to police, which
the "police refused to take . . . saying it was not true, and
that the statement should be ripped up."  The second piece of
evidence is a statement by Williams, the witness who testified

---

    [12] We note that defense counsel requested a jury instruction
on the Commonwealth's failure to conduct tests, pursuant to
Bowden, 379 Mass. at 486, which the judge denied.  "As we have
stated many times . . . a judge is not required to instruct on
the claimed inadequacy of a police investigation.  'Bowden
simply holds that a judge may not remove the issue from the
jury's consideration.'"  Commonwealth v. Williams, 439 Mass.
678, 687 (2003), quoting Commonwealth v. Boateng, 438 Mass. 498,
506-507 (2003).  Where, as here, the defendant alleges multiple
investigatory failures, specifically the subsequent testing of
potential blood evidence and the destruction of an exculpatory
statement, see discussion infra, a Bowden instruction may be
warranted. In this case, because the judge explicitly allowed
the defense to "argue to the jury what the police should have
done or failed to do" during closing argument, we find no error.

that the defendant confessed to him, which was ripped up by a
detective.

Prior to jury empanelment, defense counsel filed a motion
for sanctions, and the judge held an evidentiary hearing to
determine whether the police had destroyed exculpatory evidence;
she made findings of fact for each statement, as detailed infra.
Defense counsel's motion for sanctions should be read as a
motion to suppress, given that counsel explained he "could have
entitled it a motion to suppress, but [he was] not sure what the
appropriate sanction [was]."  In reviewing a ruling on a motion
to suppress, we "accept the judge's subsidiary findings of fact
absent clear error but conduct an independent review of his
ultimate findings and conclusions of law." Commonwealth v.
Hobbs, 482 Mass. 538, 543 (2019), quoting Commonwealth v. White,
475 Mass. 583, 587 (2016).

a.  Johnson's statement.  The judge found that although
Johnson may have made an oral or verbal statement, he did not
produce a handwritten statement.  She also found that the
defendant had not demonstrated that there was any material that
would have been exculpatory to the defendant.

The judge did not commit error in finding that Johnson did
not produce a handwritten statement.  Defense counsel did not
call Johnson to testify during the evidentiary hearing.
Although Johnson's mother initially testified that she was

unsure whether a handwritten statement was produced, she then remembered that he did produce one.  On cross-examination, his mother again stated that she was unsure whether Johnson had produced a handwritten statement.  On redirect, she testified she was "a little confused" about the handwritten statement.  In contrast, the detective who had conducted the interview with Johnson testified that he never allowed suspects or witnesses to make handwritten statements, Johnson never provided a handwritten statement, and no such statement was torn up or destroyed.

Given the mother's wavering testimony and the detective's unequivocal assertion that no handwritten statement was made, the judge's findings were not clearly erroneous.

b.  <u>Williams's statement</u>.  The judge found that after the murder, Williams spoke with a detective who began taking his statement.  Williams initially told the detective that he did not know anything about the murder and that the defendant did not say anything to Williams about the murder.  The detective printed out Williams's statement and gave it to him.  Williams affirmed the statement but did not sign it.  The detective then indicated that he was privy to additional evidence about the murder and he knew Williams was lying.  Upon hearing this, Williams stated that he was willing to tell the truth about what happened, and the detective ripped up Williams's unsigned

statement.  Although the judge noted that she "frowned upon" the handling of the statement and found the police "quite culpable" in its destruction, she ultimately concluded that the destruction of the statement "was not done intentionally to deprive the defendant of any evidence."  The judge further found that Williams's initial statement was exculpatory insofar as it could be used to impeach Williams's testimony at trial, but that it was not otherwise material to the defendant.  In light of this conclusion, the judge ruled that defense counsel could explore the circumstances surrounding the destruction of Williams's initial statements and its purported content, including by cross-examining Williams and the detective who took his statement.  The defendant argues that this remedy was inadequate.

"When a defendant makes a claim that the government has lost or destroyed potentially exculpatory evidence," he bears an initial burden of demonstrating a "reasonable possibility, based on concrete evidence" (citation omitted), that the lost or destroyed evidence was exculpatory in nature.  Commonwealth v. Williams, 455 Mass. 706, 718 (2010).  If the defendant makes such a showing, the judge "must proceed to balance the Commonwealth's culpability, the materiality of the evidence, and the prejudice to the defendant in order to determine whether the defendant is entitled to relief.".  Id.  "In reviewing the

denial of a motion based on the Commonwealth's loss [or destruction] of allegedly exculpatory evidence, we do not disturb the judge's decision absent a clear abuse of discretion." Commonwealth v. Kee, 449 Mass. 550, 554 (2007).

Williams's initial statement indicated that the defendant had not said anything about the murder.  In light of Williams's subsequent statement and testimony at trial, there was a reasonable possibility that his initial statement was exculpatory as impeachment material.  The defendant has not shown, however, that the judge's remedy was inadequate, or that dismissal of the indictment was warranted.  "Dismissal of an indictment is a remedy that infringes 'severely on the public interest in bringing guilty persons to justice.'"  Commonwealth v. Olszewski, 416 Mass. 707, 717 (1993), cert. denied, 513 U.S. 835 (1994), quoting Commonwealth v. Cinelli, 389 Mass. 197, 210, cert. denied, 464 U.S. 860 (1983).

Defense counsel engaged in a thorough cross-examination of Williams about his initial statement and its contents.  The defendant has failed to show that anything contained within Williams's initial statement would have created a reasonable doubt as to the defendant's guilt, where defense counsel's cross-examination of Williams did not.  See Commonwealth v. Kater, 432 Mass. 404, 421 (2000).

5. <u>Recusal of judge</u>.  The defendant argues that the judge erroneously failed to recuse herself when she discovered she had previously served as an attorney for the sister of a key Commonwealth witness.

Prior to the start of trial, the judge realized that, as a defense attorney, she had represented Johnson's sister in approximately 1985.  During a sidebar, the judge informed both parties that she had "some familiarity" with the witness's family, including Johnson himself and his mother, who testified for the defense in this trial during an evidentiary hearing on the motion for sanctions.  Regarding how this might affect her judgment, the judge emphasized that she was just "playing it safe":  "I don't see where this will interfere with my ability to be an impartial jurist, but I wanted to put it on the record."  Defense counsel was provided an opportunity to consult with his client, and reported that the defendant "[did] not see a problem" with the judge's prior representation.

"Because the defendant did not ask the judge to recuse herself prior to or during trial, we consider this claim to determine whether there was a substantial likelihood of a miscarriage of justice."  <u>Commonwealth</u> v. <u>Deconinck</u>, 480 Mass. 254, 267 (2018).  Here, the judge's decision not to recuse herself does not meet the standard.  The judge represented the witness's sister in a drug case sixteen years earlier, far

removed from the crime at issue.  The judge also explicitly stated on the record that she had considered her relationship with the witness's sister and did not think it would interfere with her ability to be impartial.  See Commonwealth v. Daye, 435 Mass. 463, 470 (2001) ("Here, the judge properly weighed his conscience and determined that he could discharge his duties fairly and without prejudice to the defendant").

     6.  Cumulative error and relief under G. L. c. 278, § 33E. As there was no error, there could not be any substantial likelihood of a miscarriage flowing from allegations of unpreserved cumulative error.  We decline to exercise our authority under G. L. c. 278, § 33E, to reduce the verdict or to order a new trial.

    Conclusion.  For the reasons stated, we affirm the defendant's conviction.  Furthermore, we have reviewed the record in its entirety and conclude there is no basis on which to grant extraordinary relief under G. L. c. 278, § 33E.  The denials of the defendant's motions for a new trial are also affirmed.

So ordered.