UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAMES NORRIS,          )<br>                       )<br>         Petitioner,  )<br>                       )<br>     v.                )<br>                       )<br>NELSON ALVES,          )<br>                       )<br>         Respondent.   )<br>                       ) | Civil Action No.<br>20-12234-FDS |

MEMORANDUM AND ORDER ON
PETITION FOR WRIT OF HABEAS CORPUS

**SAYLOR, C.J.**

This is a petition for a writ of habeas corpus by a prisoner in state custody. Petitioner James Norris is an inmate at the Massachusetts Correctional Institution–Norfolk. Nelson Alves is the current superintendent of that facility.

Norris was convicted of first-degree murder on November 7, 2001, on theories of premeditation and extreme atrocity or cruelty in the stabbing death of Aaron "Chad" Scott. Norris then moved for a new trial, alleging ineffective assistance of counsel. On December 20, 2019, the Massachusetts Supreme Judicial Court affirmed his conviction.

Norris has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that the SJC's ruling on his claim of ineffective assistance of counsel involved an unreasonable application of clearly established federal law. For the reasons set forth below, the petition will be denied.

I.  **Background**

    A.  **Factual Background**

The following facts are taken primarily from the opinion of the SJC in *Commonwealth v. Norris*, 483 Mass. 681 (2019).[1]

On the night of January 17, 2000, at approximately 10:30 p.m., Norris telephoned Dan Brunelle asking for a ride to the house of the victim, Aaron "Chad" Scott, and his brother. *Id.* at 682. Norris sold drugs for the Scott brothers, and Brunelle was an occasional customer. *Id.* When Brunelle arrived to pick Norris up, he told Brunelle, "I'm going to do Chad." *Id.* at 683. He then convinced Brunelle that he was joking before asking Brunelle to stop and pick up David Johnson, Norris's friend and business partner, along the way. *Id.* Johnson had been watching a basketball game at the time Norris and Brunelle arrived. *Id.* at 686. On the drive over, Brunelle lent Johnson some gloves at Norris's request. *Id.* at 683.[2]

At the Scott brothers' house, Norris and Johnson entered while Brunelle remained outside in his van. *Id.* Brunelle spotted the silhouette of a third person in the house. *Id.* Moments later, Johnson "burst out" through the storm door and pushed it closed, avoiding the apparent struggle inside the house. *Id.* Brunelle then drove to the home of Charles Varner, whom Brunelle considered a brother-in-law. *Id.*

Johnson testified that Norris and the victim began to fight once Norris entered the house. *Id.* During the fight, the two men fell against the storm door, which swung open and hit Johnson in the face. *Id.* When he pushed the storm door shut, Johnson heard the victim say,

---

[1] The SJC "recite[d] the facts the jury could have found, viewing the evidence in the light most favorable to the Commonwealth." *Norris*, 483 Mass. at 682.

[2] In his petition and memorandum, Norris claims that a cooperating witness testified at trial that he was gloved. As stated in the Commonwealth's brief before the SJC, the record does not indicate whether Norris was gloved at the scene of the crime. (Res. Supp. Answer, Ex. 1 at 412-14).

2

"Are you going to leave me for dead? I got kids . . . I got little boys," and saw Norris's arm moving up and down. *Id*. The struggle ceased, and Norris then asked Johnson for help with the victim's body. *Id*. Johnson watched as Norris tried to push the victim's body down the stairs and splashed water throughout the kitchen and the exterior of the house. *Id*.

Norris and Johnson then went to a nearby bar where Norris made a telephone call asking for help with the victim's body. *Id*. They then returned to the house where they saw a car in the driveway with Varner and Keith Freeman, a friend of Varner's. *Id*. at 683-84. Varner and Freeman had arrived at the house after Brunelle told Varner what he had witnessed. *Id*. Varner testified that Norris told him to leave—that there had been "a little beef," and that the police had already been to the house. *Id*. at 684.

Varner and Freeman began to drive away, but then decided to return to the house. *Id*. They began investigating the house, looking for the victim. *Id*. Norris claimed the victim had left the house, but Varner and Freeman spotted the victim's jacket. *Id*. As they searched, Varner first spotted what he believed to be a bloody fingerprint on the wall, then saw the victim's body at the bottom of the basement stairs. *Id*. Varner told Norris he was calling the police and left the scene with Freeman, placing a 911 call at 11:42 p.m. *Id*.

At approximately 3:00 a.m. on January 18, 2000, Norris telephoned Bernard Williams, a friend, and asked him to come over to his house. *Id*. Norris allegedly confessed to Williams that he stabbed the victim to death and threw his body down the stairs due to a disagreement having to do with "money and disrespect." *Id*.

### B. Procedural Background

#### 1. State Proceedings

##### a. Jury Trial

On March 7, 2000, a grand jury indicted Norris for the murder of Aaron Scott. (Res.

3

Supp. Answer, Ex. 1 at 172). His trial began on October 25, 2001. (*Id.*). After the Commonwealth rested, Norris moved on November 5, 2001, for a finding of not guilty due to insufficient evidence. (*Id.* at 5). The motion was denied the same day. (*Id.*). Around that time, the trial judge was made aware of a dispute between Norris and Donald Frank, his trial counsel. (*Id.* at 172-73). After a recess on November 5, to allow Norris and Frank time to discuss the dispute, the trial continued "without any further indication from Frank or Norris of any additional disputes or problems." (*Id.*). The jury ultimately found Norris guilty on November 7, 2001. (*Id.* at 5). The trial judge then imposed a life sentence. (*Id.*). On April 14, 2003, Norris appealed to the SJC. (*Id.* at 182).

### b.     First Motion for New Trial

On November 12, 2003, Norris filed a motion for a new trial with the SJC, which was immediately remanded to the Hampden Superior Court. (*Id.* at 11, 182). Norris alleged that his trial counsel was constitutionally ineffective because he failed to (1) investigate an alibi defense; (2) investigate destroyed and purportedly exculpatory evidence; (3) test relevant physical evidence; (4) investigate and utilize information to impeach Johnson's testimony; (5) test material found underneath the victim's fingernails; (6) retain a medical expert to review cuts found on Norris's hands; and (7) impeach witnesses for the Commonwealth with prior convictions. (*Id.* at 16-17). Norris also requested funds to review and test forensic evidence related to the material underneath the victim's fingernails, cuts on his hands, and a shoeprint found at the scene of the crime. (*Id.* at 17-18).

On May 20, 2005, the trial court denied his motion. (*Id.* at 116). On October 6, 2005, it denied a motion for reconsideration. (*Id.* at 7, 126). On February 9, 2006, the court granted a motion for DNA testing of the material found underneath the victim's fingernails. (*Id.* at 173).

### c.     Second Motion for New Trial

On June 23, 2016, Norris submitted a second motion for a new trial to the SJC, which was remanded to the trial court on December 5, 2016. (*Id*.). He alleged that he received ineffective assistance of counsel because trial counsel allegedly failed to (1) review photographic evidence of the crime scene with a forensic expert, including footprints; (2) seek to introduce evidence that the victim had left messages on his girlfriend's answering machine "moments before" the murder took place; (3) argue an alternate theory that the victim's housemate Rico was the murderer; (4) investigate a tire track at the crime scene; (5) investigate the material underneath the victim's fingernails; and (6) seek to introduce evidence that when the police first arrived at the crime scene, they "found no blood or evidence of violence at that time." (*Id*. at 133-37).

An evidentiary hearing on the second motion was held on February 13 and 14, 2018, at which time trial counsel testified that he and Norris had a dispute about whether Norris's girlfriend should testify. (*Id*. at 173, n.1). The trial court denied the motion on May 22, 2018. (*Id*. at 172).

### d.     Appeal to SJC

On February 15, 2019, Norris filed a brief incorporating both denials of the two motions for a new trial into his appeal with the SJC. (*Id*. at 184). He again alleged ineffective assistance of counsel, contending that trial counsel failed to (1) impeach the Commonwealth's theory or timeline of events; (2) properly investigate forensic evidence; (3) investigate alternative theories or suspects; and (4) explore an alibi defense. *Norris*, 483 Mass. at 686-91. He also contested the admission of evidence at trial of certain blood testing results; the trial judge's failure to sanction the Commonwealth for the alleged destruction of exculpatory evidence by the police; and the trial judge's failure to recuse herself because of a purported conflict of interest. *Id*. at 691-96.

On December 20, 2019, the SJC affirmed his conviction. *Id*. at 696.

### 2. Federal Proceedings

Norris then petitioned for a writ of habeas corpus on December 16, 2020, alleging ineffective assistance of counsel pursuant to 28 U.S.C. § 2254. Specifically, he contends that his trial counsel was ineffective for failing to (1) impeach the Commonwealth's witnesses for inconsistencies as to testimony concerning whether he was gloved; (2) use evidence purportedly contradicting the Commonwealth's theory of the case; (3) test material found underneath the victim's fingernails; (4) offer evidence that the police, in their initial response to the crime scene, did not find blood or evidence of violence; (5) offer an alibi defense; (6) offer evidence of third parties who might have had motives to murder the victim; and (7) impeach testimony that he was at the scene of the crime during its commission. (Pet. for Writ of Habeas Corpus, Ex. 1 at 1).

## II. Analysis

### A. Standard of Review

If an independent and adequate state-law ground does not preclude review, an application for a writ of habeas corpus brought by a state prisoner "with respect to any claim that was adjudicated on the merits in state court proceedings" may be granted only if those proceedings (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). However, if a claim was not adjudicated on the merits in state-court proceedings, then the claim should be reviewed *de novo* by the federal district court. *Cooper v. Bergeron*, 778 F.3d 294, 299 (1st Cir. 2015).

"Section 2254(d) thus demands an inquiry into whether a prisoner's claim has been adjudicated on the merits in state court; if it has, [§ 2254(d)]'s highly deferential standards kick

in." *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (quotation marks omitted).  To decide a federal claim on the merits, it is not necessary for a state court to explain its reasons in an opinion or to "cite or even be aware of" Supreme Court case law.  *Harrington v. Richter*, 562 U.S. 86, 98 (2011).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Id.* at 99.

      **B.**      <u>**Claim of Ineffective Assistance of Counsel**</u>

           **1.**      <u>**Standard**</u>

Claims of ineffective assistance of counsel under the Sixth Amendment must satisfy the two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984).  To establish ineffective assistance, a petitioner must establish both (1) that his counsel provided deficient assistance and (2) that he suffered prejudice as a result.  *Id.* at 687.

The first prong of the *Strickland* test requires a petitioner to demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.  There is a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689); *see also Genius v. Pepe*, 147 F.3d 64, 66 (1st Cir. 1998) ("[C]ounsel's judgments in formulating the defense strategy are entitled to substantial deference.").  A petitioner may overcome the presumption by demonstrating that counsel's alleged errors were so serious that his performance "fell below an objective standard of reasonableness under the circumstances." *Sleeper v. Spencer*, 510 F.3d 32, 38 (1st Cir. 2007) (citing *Strickland*, 466 U.S. at 687-88); *see also Lynch v. Ficco*, 438 F.3d 35, 49 (1st Cir. 2006).

The second prong of the *Strickland* test requires a petitioner to show that counsel's deficient performance resulted in "prejudice"—that is, that "counsel's errors were so serious as

to deprive the [petitioner] of a fair trial, a trial whose result [was] reliable." 466 U.S. at 687. Stated differently, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *Sleeper*, 510 F.3d at 39.

"Surmounting *Strickland's* high bar is never an easy task." *Harrington*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because both standards are "highly deferential." *Id.* (quoting *Strickland*, 466 U.S. at 689). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* A petitioner alleging ineffective assistance under § 2254(d) must not only demonstrate that counsel was ineffective under the *Strickland* standard, but "must also demonstrate that the state court's denial of his claim was objectively unreasonable." *Abrante v. St. Amand*, 595 F.3d 11, 19 (1st Cir. 2010).

2.  **Analysis**

A threshold question is whether the state court adjudicated petitioner's ineffective assistance of counsel claim on the merits. If so, then the deferential standards of § 2254(d) apply; if not, then this Court reviews the issue *de novo*. "A matter is 'adjudicated on the merits' if there is a 'decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground.'" *Teti v. Bender*, 507 F.3d 50, 56-57 (1st Cir. 2007) (citing *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001)). Here, both parties agree that the SJC's decision should be reviewed under the standards of § 2254(d), requiring federal habeas courts to defer to state-court determinations unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d).[3]

To succeed on his claim, petitioner must show that the SJC's decision as to trial counsel's performance "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103; *Rivera v. Thompson*, 879 F.3d 7, 13 (1st Cir. 2018). This Court must analyze the SJC's determination under the "highly deferential standards" of § 2254(d). *Davis*, 576 U.S. at 269.

As a preliminary matter, petitioner contends that the SJC improperly considered each of the alleged deficiencies of counsel individually, rather than evaluating the ineffectiveness of counsel viewed as a whole. It is true that under *Strickland*, a court must "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690. However, petitioner mischaracterizes the analysis performed by the SJC. The SJC "reviewed the record in its entirety" and concluded that petitioner was not entitled to relief under Mass. Gen. Laws ch. 278, § 33E. *Norris*, 483 Mass. at 696. The SJC examined each alleged deficiency of counsel for error individually and

---

[3] The state trial court evaluated petitioner's claim for ineffective assistance of counsel under the standard articulated in *Commonwealth v. Saferian*, 366 Mass. 89 (1974). The *Saferian* standard is the functional equivalent of the federal *Strickland* standard. *See Powell v. Tompkins*, 783 F.3d 332, 349 n.12 (1st Cir. 2015) (citing *Ouber v. Guarino*, 293 F.3d 19, 32 (1st Cir. 2002)). The SJC evaluated petitioner's claim for ineffective assistance of counsel under Mass. Gen. Laws ch. 278, § 33E. That standard is even "more favorable to a defendant than is the constitutional standard for determining the ineffectiveness of counsel." *Commonwealth v. Wright*, 411 Mass. 678, 682 (1992). The First Circuit has concluded that the § 33E standard "is 'at least as protective of the defendant's rights as its federal counterpart.'" *Lucien v. Spencer*, 871 F.3d 117, 129 (1st Cir. 2017) (quoting *Kirwan v. Spencer*, 631 F.3d 582, 590 n.3 (1st Cir. 2011)).

cumulatively and also concluded that, under § 33E, "there could not be any substantial likelihood of a miscarriage flowing from allegations of unpreserved cumulative error." *Id.*[4] This Court reaches the same conclusion for reasons articulated below. *See Field v. Hallett*, 2022 WL 2128442, at *8 (1st Cir. June 14, 2022) (finding that petitioner was not entitled to relief on cumulative error claim because "[a]bsent any particularized error, there can be no cumulative error") (internal citation and quotation marks omitted).

### a. Failure to Impeach Commonwealth's Theory of Events

Petitioner first contends that the SJC unreasonably dismissed trial counsel's alleged failure to impeach the Commonwealth's theory of events with photographic evidence. That photographic evidence included "a photo of the crime scene [that] . . . demonstrates that the killer was ungloved." (Pet'r's Mem. at 8).[5] It also included another photo that "demonstrates that a CD player was stolen by someone with blood on their hands" which "contradicts the theory . . . that the defendant traveled with two men to the scene, killed the victim, . . . remained at the scene for some time, and even requested help from others that they clean the property with him." (*Id.* at 8-9). Petitioner appears to suggest that this evidence undermines the Commonwealth's theory of the crime in two ways: by rebutting the inference that the killer was wearing gloves and undermining the theory that petitioner "killed the victim and remained at the scene for some time afterward." *Norris*, 483 Mass. at 686-87.[6]

---

[4] The cases cited by petitioner on that point are inapposite. Petitioner cites *In re Winship*, 397 U.S. 358 (1970), but makes no allegation of inversion of the standard of proof. *Cf. Lynch*, 438 F.3d at 42 (holding that failure to object to inverting jury instruction was ineffective assistance of counsel). Petitioner likewise invokes *Brady v. Maryland*, 373 U.S. 83 (1963) but makes no claim of counsel's failure to raise a *Brady* issue.

[5] Although not clearly stated in petitioner's memorandum, he appears to be referring to "photographs of a dresser with bloody handprints located at the scene." *Norris*, 483 Mass. at 686.

[6] The record is unclear as to whether petitioner was gloved. Under the facts as recited by the SJC, petitioner "request[ed] [that Brunelle] lend Johnson his gloves." *Norris*, 483 Mass. at 683. The SJC did not mention, however, whether petitioner actually wore gloves. *See id.* At trial, Johnson testified that "[Norris] tried to hand [him] some gloves" after splashing water in the house. (Res. Supp. Answer, Ex. 8 at 32-33). Likewise, in trial

10

The SJC observed that even if admitted, such evidence "does not preclude the jury from finding that the [petitioner] committed the murder" because of the "possibility that an unknown third party could have entered and ransacked the home." *Id.* at 687. That is, the evidence is consistent with the possibility that an ungloved, unknown third party ransacked the home, and it does not necessarily impeach the Commonwealth's theory of the case. "[T]rial counsel need not probe every inconsistency in the evidence, 'particularly where the alleged inconsistency does not pertain to defense counsel's theory of the case.'" *Jewett v. Brady*, 634 F.3d 67, 73 (1st Cir. 2011) (quoting *Commonwealth v. Jewett*, 442 Mass. 356, 363 (2004)). The SJC further determined that "[t]his evidence [was] unlikely to have influenced the jury's conclusion in any way." *Norris*, 483 Mass. at 687.[7] Accordingly, it was not unreasonable for the SJC to conclude that the alleged failure to impeach the Commonwealth's theory of events did not constitute ineffective assistance of counsel.[8]

### b. Failure to Investigate Alternative Theories

Petitioner next contends that trial counsel was deficient in failing to "offer evidence during trial that police first went to the crime scene responding to a disturbance call and found no blood or evidence of violence at that time." (Pet'r's Mem. at 9). In fact, blood was found on the door and in the snow outside the victim's house only when police responded for a second time,

---

counsel's closing argument, he stated to the jury: "[y]ou know that Terry Norris wore gloves, because David Johnson described them to you." (Res. Supp. Answer, Ex. 10 at 101). In any event, the SJC appears to have accepted petitioner's claim that the jury could have drawn an inference that he was gloved.

[7] The trial judge observed that the photographic evidence did not relate to the "more significantly developed third-party killer defense" that the "defendant [had] already presented." (Res. Supp. Answer, Ex. 1 at 179). Trial counsel had presented a "third-party killer theory at trial by attempting to implicate two of the Commonwealth's key witnesses – Brunelle and Johnson." *Norris*, 483 Mass. at 690.

[8] Likewise, to the extent that petitioner contends the SJC unreasonably determined facts, petitioner has failed to show clear and convincing evidence of an erroneous factual determination by the SJC. *See* 28 U.S.C. § 2254(e)(1).

11

this time after the victim was found. *Norris*, 483 Mass. at 689. Petitioner appears to contend that trial counsel was deficient in failing to investigate an alternative theory or suspect based on that evidence.

The SJC observed that trial counsel presented a third-party killer theory focusing "on the witnesses who identified the defendant as the murderer" instead of focusing on the police testimony. *Id.* at 689-90; (Res. Supp. Answer, Ex. 1 at 179). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. There is a "strong presumption that counsel's strategy and tactics fall within the range of reasonable professional assistance." *Knight v. Spencer*, 447 F.3d 6, 15 (1st Cir. 2006). Counsel is afforded "wide latitude" in determining how best to represent a client and exercise professional judgment in decision-making. *Sleeper*, 510 F.3d at 38-39. Given the latitude afforded to the strategic decisions of counsel, it was reasonable for the SJC to conclude that failing to investigate an alternative theory or suspect based on the police testimony did not constitute ineffective assistance.

Furthermore, the information about the earlier visit by police officers "was before the jury." *Norris*, 483 Mass. at 689. The SJC stated that "it is unclear how this evidence casts doubt on the Commonwealth's theory of the crime. . . . [T]he jury could have inferred from the evidence at trial that the defendant committed the crime and left the scene only to return to the scene later and transfer the blood to the door and snow at that time." *Id.* Petitioner nevertheless contends that the Commonwealth's theory that he splashed water inside the victim's house is inconsistent with the inference that he returned later and transferred the blood. However, the

12

SJC's determination is reasonable under the circumstances. For example, under the Commonwealth's theory, petitioner left the crime scene and subsequently "used a pay telephone to call someone to help him dispose of the body and clean up." *Id.* at 683. That is consistent with the possibility that he transferred blood at a later time. *Id.* at 689. Therefore, it was reasonable for the SJC to conclude that trial counsel did not provide ineffective assistance on that basis.

### c. Failure to Explore an Alibi Defense

Petitioner then contends that trial counsel "abandoned an alibi defense" and instead "admitted that [petitioner] was at the scene in [counsel's] opening and closing." (Pet'r's Mem. at 11).[9] The alibi defense allegedly consisted of "affidavit testimony of the defendant's grandmother" that he "had been home at the time of the killing." (*Id.*).[10] According to petitioner, the grandmother was prepared to testify "that, on the night of the murder, she was at home watching the nightly news with [petitioner] and her daughter." *Norris*, 483 Mass. at 690.

At trial, Brunelle testified that "he picked up the defendant from the grandmother's home." *Id.* at 691. An investigative report, however, stated that "the grandmother told a police officer that she had not seen the defendant for from one week to ten days prior to the crime." *Id.* While petitioner's girlfriend was also allegedly an alibi witness, "when the time came to call her at trial, the defendant insisted that she not be called to testify." *Id.* at 691 n.9; (Res. Supp.

---

[9] In the present petition, petitioner does not renew the argument that trial counsel should have attempted to locate two persons, named "Keith" and "Sue," to testify about his whereabouts on the night of the murder. (*See generally* Pet'r's Mem.); *Norris*, 483 Mass. at 690. In any event, that was supported by less evidence than the grandmother's alibi defense, and it was not unreasonable for the SJC to conclude that declining to investigate that defense was not ineffective assistance of counsel. *Norris*, 483 Mass. at 691.

[10] The grandmother referred to by petitioner appears to be the grandmother of his children, not his own grandmother. *Norris*, 483 Mass. at 690.

13

Answer, Ex. 13 at 33-35).[11]

"In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. Counsel is afforded "wide latitude . . . in making tactical decisions." *Id.* at 689; *see also Commonwealth v. Vao Sok*, 435 Mass. 743, 758 (2002). The grandmother's testimony in the investigative report is inconsistent with the purported alibi defense that petitioner was at home with her. *Norris*, 483 Mass. at 691. The SJC thus reasonably concluded that it was not ineffective assistance for "trial counsel to decline to rely on the grandmother's testimony to establish an alibi defense" because of the inconsistencies in her testimony. *Id.*

Furthermore, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691. Here, trial counsel appears to have made a tactical decision not to call the girlfriend as a witness because of petitioner's request. (Res. Supp. Answer, Ex. 13 at 34, 39-40). Moreover, it appears that the girlfriend was prepared to testify that petitioner was at the scene of the crime, further supporting trial counsel's decision to call neither the grandmother nor the girlfriend as witnesses. (*See id.* at 33) (suggesting that trial counsel's opening admission that petitioner was at the scene of the crime "was based on what it was that [the girlfriend] said" during trial preparation). The SJC therefore reasonably concluded that failure to explore the purported alibi defense was not ineffective assistance of counsel. *Norris*, 483 at 690-91.

---

[11] In the same footnote, the SJC also stated that "[a]t an evidentiary hearing on the defendant's second motion for a new trial, trial counsel could not recall much about the case." *Norris*, 483 Mass. at 691 n.9. Petitioner appears to suggest that is indicative of counsel's ineffectiveness at trial, but the record clearly indicates counsel had difficulty recalling the case at the time of the evidentiary hearing, approximately 17 years later. (*See* Res. Supp. Answer, Ex. 13 at 4).

#### d.        Failure to Investigate Alternative Suspects

Petitioner next contends that trial counsel failed to adequately "rally evidence" for a third-party killer defense. (Pet'r's Mem. at 12). He alleges that there is significant evidence implicating the victim's brother Rico, unknown drug associates in New York, and unidentified persons who drove vehicles allegedly already at the scene of the crime. (*Id.* at 12-15).

The SJC observed that "counsel did present a third-party killer theory at trial by attempting to implicate two of the Commonwealth's key witnesses – Brunelle and Johnson." *Norris*, 483 Mass. at 690. While the third-party killer theory presented by trial counsel ultimately proved unsuccessful, the SJC concluded that "there is nothing to indicate that the outcome of trial would have been different had counsel advanced . . . these other third-party culprits, who were 'even more attenuated from the scenario than Brunelle and Johnson.'" *Norris*, 483 Mass. at 690; *see also Linton v. Saba*, 2014 WL 4804746, at *10 (D. Mass. Sept. 25, 2014), *aff'd*, 812 F.3d 112 (1st Cir. 2016) (holding that counsel was not ineffective for declining to pursue third-party killer theories based on speculative evidence). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Trial counsel need not "pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). The SJC thus reasonably concluded that trial counsel was not ineffective for "focus[ing] on the witnesses who identified the defendant as the murderer, rather than unidentified individuals or vehicles, in formulating a third-party culprit defense." *Norris*, 483 Mass. at 690.

#### e.        Failure to Impeach Commonwealth's Timeline of Events

Petitioner also asserts that trial counsel failed to investigate and utilize "information that materially impeached" Johnson, a key witness for the Commonwealth. (*See* Pet'r's Mem. at 15).

15

Petitioner points only to evidence about the timing of a basketball game that Johnson claimed to be watching when petitioner picked him up on the night of the murder. (*Id.*). In his trial testimony, Johnson claimed to be watching a basketball game that had nearly concluded the third quarter when petitioner arrived at his house. *Norris*, 483 Mass. at 687; (Res. Supp. Answer, Ex. 8 at 22). Petitioner claims that, based on the start time and recorded duration of the basketball game, "Johnson could not have been watching this game until the end of the third quarter and been with the defendant at the time of the killing." *Norris*, 483 Mass. at 687.

The SJC concluded that "impeachment as to the timing of the basketball game was unlikely to have influenced the jury, given that Brunelle testified that he brought the defendant and Johnson to the victim's house sometime after 10:30 p.m." *Id.* at 688.[12] Trial counsel also attempted to impeach Johnson in a number of other ways, such as raising his prior convictions and pending criminal proceedings, implicating him in a third-party killer theory, and raising ulterior motives for his testimony. (Res. Supp. Answer, Ex. 8 at 47-50, 104-05). "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Knight*, 447 F.3d at 17 (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003)); *see also Jewett*, 442 Mass. at 363. The SJC therefore reasonably concluded that trial counsel was not ineffective for failing to pursue that particular impeachment strategy.

### f. <u>Failure to Properly Investigate Forensic Evidence</u>

Finally, petitioner contends that trial counsel was ineffective by failing to test material found underneath the victim's fingernails. Petitioner's post-trial motion for DNA testing was

---

[12] Petitioner does not renew an argument made to the SJC that trial counsel failed to impeach witnesses with prior convictions. The Court accordingly does not address the issue. *See Williams v. Roden*, 2010 WL 2428822, at *10 (D. Mass. Apr. 6, 2010) (stating that "[a]rguments not briefed [in petition for writ of habeas corpus] are deemed waived").

ultimately granted, and that "testing revealed the only DNA present under the victim's fingernails belonged to the victim himself." *Norris*, 483 Mass. at 689. He contends that the lack of secondary DNA underneath the victim's fingernails undermines the Commonwealth's theory of a violent fight with the victim.[13]

The SJC compared the results of the present case to *Commonwealth v. Cameron*, where DNA evidence belonging to someone other than the victim was recovered and DNA testing excluded the defendant as the donor. 473 Mass. 100 (2015). The SJC concluded that, unlike in the case of *Cameron*, the lack of either exculpatory or incriminating DNA evidence "would not have influenced the jury's verdict." *Norris*, 483 Mass. at 689. "Prejudice is an independent requirement for relief, and [petitioner]'s argument as to prejudice rests almost entirely upon 'mays' and 'could haves'" in the absence of exculpatory DNA evidence. *Rice v. Hall*, 564 F.3d 523, 526 (1st Cir. 2009). Petitioner has failed to show that the SJC's conclusion about the DNA evidence "is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (quoting *Harrington*, 562 U.S. at 103).

### g. Conclusion

In summary, the decision of the Supreme Judicial Court to deny relief was not contrary to, and did not involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

---

[13] Petitioner does not re-raise the argument that trial counsel failed to properly investigate his alleged footprint. (*See generally* Pet'r's Mem.); *Norris*, 483 Mass. at 688.

### III. Conclusion

For the foregoing reasons, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d) is DENIED.

**So Ordered.**

Dated: June 16, 2022

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court